FILED
2008 Oct-23  PM 01:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

FEDERATED MUTUAL
INSURANCE COMPANY,                )

)

     PLAINTIFF,                )

)

VS.                                                      )          **2:06-cv-1922-JHH**

)

MARUBENI  CITIZEN-CINCOM,
INC.,                                                  )

)

     DEFENDANT.                )

## MEMORANDUM OF OPINION

The court has before it the February 19, 2008 motion (doc. # 45) of defendant
Marubeni-Citizen Cincom, Inc. (hereinafter "MCCI") for summary judgment.
Pursuant to the court's orders of February 22, 2008 (doc. # 47), April 16, 2008 (doc.
# 51), and May 6, 2008 (doc. # 53), the motion was deemed submitted, without oral
argument, on June 3, 2008.[1]

## I.      Procedural History

Plaintiff Federated Mutual Insurance Company ("Federated") commenced this

---

[1] At the continued representation by the parties that the case could be successfully
mediated with additional time, the court, on two separate occasions, (see docs. # 47, 51) delayed
setting a briefing schedule on the motion for summary judgment.

action on September 26, 2006 by filing a complaint in this court alleging, in pertinent part,[2] that MCCI sold a defective and unreasonably dangerous lathe as prohibited by the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") (Count II), breached an implied warranty of merchantability (Count IV), and breached an implied warranty of fitness for a particular purpose (Count VI).  (See generally Compl.)

On February 19, 2008 MCCI filed a motion (doc. # 45) for summary judgment asserting that plaintiff's claims fail as a matter of law.  In accordance with the most recent order (doc. # 53) governing summary judgment deadlines in this case, the parties have each filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief (doc. # 45) and evidence[3] (doc. # 45) in support of its own motion for summary judgment on February 19, 2008 and on May

---

[2] The original complaint also names Kearney Machinery and Supply, Inc. ("Kearney") as a defendant in this case.  However, on December 17, 2007 Federated and Kearney filed a Joint Stipulation of Dismissal (doc. # 42) with the court.  That stipulation eliminated the claims asserted in Count I, Count III, and Count V and was approved by court order (doc. # 44) dated December 18, 2007.  Therefore, remaining in this action is the claim of Federated Mutual Insurance Company v. Marubeni Citizen-Cincom, Inc.

[3] The defendant submitted the following evidence: Complaint for Property Damage filed in the Northeastern Division of the Northern District of Alabama on September 26, 2006 (Exhibit 1); excerpts from the deposition of Chad Falciani (Exhibit 2); excerpts from the deposition of Timothy Duffy (Exhibit 3); excerpts from the deposition of John Antignani (Exhibit 4); excerpts from the deposition of Jeremy Summerford (Exhibit 5); excerpts from the deposition of Peter J. Schwalje (Exhibit 6); the Cincom M20/M32 Basic Manual (Exhibit 7); a copy of the accident report signed by Loyd Brasher (Exhibit 8); a copy of Plaintiff's Motion for Leave to Amend Complaint with Memorandum of Law and attachments (Exhibit 9); the Report of Findings of Joseph R. Filas, Fire Consultant and Thomas W. Young, Eastern Regional Fire Manager (Exhibit 10); and excerpts from the deposition of Joseph R. Filas (Exhibit 11).

13, 2008 filed a Supplemental Brief (doc. # 54) in Support of Motion for Summary Judgment.  On May 27, 2008, plaintiff filed a brief (doc. # 57) and evidence[4] (doc. # 57) in opposition to defendant's motion for summary judgment.  On June 3, 2008, defendant filed a brief (doc. # 58) in reply to plaintiff's opposition.

There are no additional pending motions in this case.

## II.    Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323.  Once the moving party has met its

---

[4] The plaintiff submitted the following evidence: Plaintiff Federated Mutual Insurance Company's Response to Defendant Marubeni Citizen-Cincom Inc.'s Statement of Undisputed Facts and Plaintiff's Statement of Disputed and Additional Undisputed Facts (Exhibit 1); the complete deposition of Chad Falciani (Exhibit 2); the complete deposition of Jonathan Baldwin (Exhibit 3); the complete deposition of Jeremy Summerford (Exhibit 4); the complete deposition of Joseph R. Filas (Exhibit 5); the complete deposition of Peter J. Schwalje (Exhibit 6); the complete deposition of John C. Kearney (Exhibit 7); and the affidavit of Jeremy Summerford (Exhibit 8).

burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not

4

controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand

5

a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

III.    **Relevant Undisputed Facts**[5]

This is a subrogation action brought by Federated to recover payment of an insurance claim made to the insured, Falciani Machine, Inc. ("Falciani"). Falciani manufactures precision components for the military/defense, aerospace, medical, and commercial industries. (Compl. at ¶¶ 36, 46, 52.) MCCI imports and distributes machine tools manufactured by Citizen Watch, Ltd. of Japan and Kearney is the exclusive sales dealer of Citizen lathes for Alabama. (Compl. at ¶¶ 36, 46, 52.)

In the summer of 2006, Falciani was looking to purchase a "Swiss style" CNC lathe for the highly specific purpose of manufacturing titanium sagittal orthopedic screws for use in back surgery. (Falciani Dep. at 20-22, 24.) Falciani had previously purchased Citizen machines but none of those owned by Falciani were capable of

---

[5] If the facts are in dispute, they are stated in a manner most favorable to the plaintiff. See Fitzpatrick, 2 F.3d at 1115.

manufacturing sagittal screws. (Falciani Dep. at 24.)  Therefore, Chad Falciani contacted Kearney sales representative Peter Browne about purchasing a Citizen lathe for that specific purpose. (Falciani Dep. at 19, 23.)

Falciani worked with Browne on identifying a specific lathe to manufacture the screw within Falciani's production goals. (Falciani Dep. at 26.)  Browne conferred with MCCI sales engineer Tim Duffy regarding the suitability of various Citizen machines for Falciani's application.  (Falciani Dep. at 26; Duffy Dep. at 17-20.) Falciani ultimately decided, upon MCCI's recommendation, to purchase two Citizen M32Y lathes. (Falciani Dep. at 25.)  Because Kearney was a non-billing dealer, the purchase orders were issued to MCCI.  (Antignani Dep. at 26.)  The lathes were manufactured and packaged in Japan and MCCI did not open the packages or modify the lathes prior to shipping them to Falciani. (Antignani Dep. at 103.)

The machines were delivered to Falciani in September 2005, approximately one month before the subject fire. (Compl. at ¶ 6; Baldwin Dep. at 29-32.) After the sale and delivery of the lathes, Kearney and Falciani experienced difficulties in installing and programming, as well as running acceptable parts on the lathes. (Falciani Dep. at 39-40; Baldwin Dep. at 29-32.) To help facilitate production, MCCI

service and sales employees went to the Falciani plant to aid Falciani[6] and Kearney employees in operating the machine. (Falciani Dep. at 39-40.)  John Baldwin, a senior applications engineer who had worked for MCCI for approximately 13 years, was one of the MCCI employees sent to Alabama to troubleshoot the problems. (Baldwin Dep. at 14, 29, 37.)  Although the computer program that was originally supplied to control the lathe was "runable," Baldwin and other of MCCI's engineers decided after a few days to reprogram the lathe. (Baldwin Dep. at 34.)  Once the new programming was installed and the process stabilized, Baldwin then turned his attention to training the Falciani operators on lathe operation. (Baldwin Dep. at 37.) The training included on-the-job instruction by MCCI employees, wherein MCCI observed Falciani's various work shifts, including the night shift. (Summerford Dep. at 61, 63.)   Following approximately three weeks of set up, programming, and troubleshooting, (including training of several days to one week), Falciani took over production on the lathe. (Falciani Dep. at 39-40; Summerford Dep. at 59.)

Falciani was on a tight time schedule to produce the sagittal screws for its customer and so was operating 24 hours a day with two 12-hour shifts. The M32Y

---

[6] Falciani relied on MCCI to perform all of the training because Falciani considered MCCI to be the expert on the task of operating the lathe. (Falciani Dep. at 35.)

machines, which had been placed in Falciani's "downhill" building,[7] were in steady operation. (Summerford Dep. at 40-41.) In the course of that operation, the lathes were fed bars of titanium, a metal known to combust, from a bar feeder. (Schwalje Dep. at 23.) From there the titanium was cut by a series of tools. (Duffy Dep. at 81-83.) The process generated extreme friction and high heat.[8] (Duffy Dep. at 81-83.) For that reason, a hydrocarbon coolant was applied to the process by a pump and nozzles.[9] (Duffy Dep. at 81-83.)

Falciani night supervisor Jeremy Summerford was solely operating the M32Y lathe on the night and morning of October 25 and 26, 2005. (Summerford Dep. at 41.) He set the lathe to run a cycle and then left the machine unattended for approximately one hour while he attended to other matters in the "uphill" building. (Summerford Dep. at 42-45.) Near 4:00 a.m. on the morning of October 26, 2005, Summerford checked on the lathe. (Summerford Dep. at 42-45.) He cleaned out all chips from the bottom of the bin, scraped pieces away from the hose, and checked the

_____

[7] The Falciani facility consisted of two temporary buildings while a permanent facility was under construction. (Summerford Dep. at 40-41.) The two buildings were referred to as the "uphill" and "downhill" buildings. (Summerford Dep. at 40-41.)

[8] The machine was delivered with warning decals and a manual that addressed issues related to fire. (Duffy Dep. at 81-83; Cincom M20/M32 Basic Manual at 2-20.) Falciani employees understood titanium to be flammable. (Falciani Dep. at 94; Summerford Dep. at 13.)

[9] This particular CNC lathe was equipped with 10 coolant nozzles, nine of which swivelled through the use of knuckle joints and one that was permanently fixed. (Schwalje Dep. at 66-67.)

level of the coolant. (Summerford Dep. at 48.) After observing no problems, Summerford reset the machine to run another cycle. (Summerford Dep. at 42-46.) He then watched the operation of the machine for a few moments and observed coolant flowing from every nozzle.[10] (Summerford Aff. at ¶ 12.) He left the Falciani facility an hour later without checking on the lathe. (Summerford Dep. at 54.)

At 5:33 a.m. on October 26, 2005, the Madison Fire Department was alerted by alarms that a fire had broken out at the Falciani facility. (Doc. # 45, Exh. 8, Madison Fire Department Report.) Fire department personnel arrived at the scene at 5:42 a.m. (Doc. # 45, Exh. 8, Madison Fire Department Report.) The fire was contained to one machine with "heavy smoke" but "minimal smoke damage." (Doc. # 45, Exh. 8, Madison Fire Department Report.) The fire was extinguished and the final fire department unit cleared the Falciani premises at 7:57 a.m. (Doc. # 45, Exh. 8, Madison Fire Department Report.)

## IV.    Applicable Substantive Law and Analysis

Plaintiff's complaint, in relevant part,[11] contains the following claims: liability

---

[10] The piece being machined was hard to see because so much coolant was flooding the area where the screw was located. (Summerford Aff. at ¶ 12.)

[11] See footnote 2, supra.

10

under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD")[12] (Count II), breach of implied warranty of merchantability (Count IV), and breach of implied warranty of fitness for a particular purpose (Count VI).   (See generally Compl.) Defendant's motion (doc. # 45) for summary judgment asserts that plaintiff has failed to establish a prima facie case and that there is no genuine issue of material fact as to any of plaintiff's claims against defendant.

### A.   The Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") (Count II)

Count II of the Complaint alleges that at the time MCCI sold the lathe to Falciani, it was in an unreasonably dangerous defective condition and as such directly and proximately caused Falciani to suffer damages.   (See Compl. ¶¶ 36-37.)   To establish liability under the AEMLD, the plaintiff must show that:

(1)   he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

    (a)   the seller is engaged in the business of selling such a product, and

    (b)   it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)   Showing these elements, the plaintiff has proven a prima facie case

---

[12] The sole basis of Federated's AEMLD claim is that the product was flawed at the time of purchase. (Compl. ¶ 36.)  The claim is not based on a failure to warn.

although

(a)    the seller has exercised all possible care in the preparation and sale of his product, and

(b)    the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.

Casrell v. Altec Industries, Inc., 335 So. 2d 128, 132-33 (Ala. 1976); Atkins v. American Motors Corp., 335 So. 2d 134 (Ala. 1976); see also Nettles v. Electrolux Motor AB, 784 F.2d 1574 (11th Cir. 1986) (applying Alabama law) and Morguson v. 3M Co., 857 So.2d 796, 800 (Ala. 2003) (internal citations and quotations omitted).

Thus, the focus of an AEMLD claim is on the fault of the manufacturer in placing a product which is in an unreasonably dangerous condition in the stream of commerce. The dangerous defect must have existed in the product at the time it was manufactured. Townsend v. General Motors Corp., 642 So. 2d 411, 415 (Ala. 1994). An "unreasonably dangerous" defective condition is defined under the AEMLD as one that causes a product to fail to meet the reasonable expectations of an ordinary consumer as to its safety and may arise from the product's design, manufacture, or failure to warn. Casrell, 335 So. 2d at 133; see also Tillman v. Reynolds Tobacco Co., 89 F.Supp. 2d 1297, 1300 (S.D. Ala. 2000), vacated on other grounds, Tillman v. R.J. Reynolds Tobacco, 340 F.3d 1277 (11th Cir. 2003). "The article sold must be

dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Id., citing Comment I. of § 402 A, Restatement of Torts 2d.

But a manufacturer is not liable simply because the product is not as safe as possible. Townsend, 642 So.2d at 415; see also General Motors Corp v. Edwards, 482 So. 2d 1176 (Ala. 1985), overruled on other grounds, Schwartz v. Volvo N. America Corp., 554 So. 2d 927 (Ala. 1989) (holding that "failure of a product does not presuppose the existence of a defect").  As relevant here, the plaintiff always bears the burden of showing that the alleged defective condition of the product proximately caused his injury. See Taylor v. General Motors Corp., 707 So.2d 198, 202 (Ala. 1997), citing Sears, Roebuck & Co. v. Haven Hills Farm, Inc., 395 So.2d 991, 995 (Ala. 1981) ("[T]hat which rendered the product in such unfit condition caused the injury.").  This may be accomplished where the evidence raises a reasonable inference from which the fact finder may rationally conclude that plaintiff's injuries and damages resulted proximately from the product's failure of performance causally related to its defective condition. See Sears, 395 So.2d at 995, citing Atkins v. Am. Motors Corp., 335 So.2d 134, 140 (Ala. 1976); see also Brooks v. Colonial Chevrolet-Buick, Inc., 579 So. 2d 1328, 1332 (Ala. 1991) and Haven Hills, 395 So.2d at 995.  It is upon this theory that Federated proceeds with its case

against MCCI.[13]  (See Doc. # 57 at 9-16.)

Federated maintains that the lathe was unreasonably dangerous as contemplated by Sears because it was essentially brand new, was performing the task it was designed to perform, and nevertheless spontaneously erupted with fire.  (See Doc. # 57 at 12.)  But that set of facts alone cannot create an inference of defectiveness.  The Alabama Supreme Court has repeatedly held that the failure of a product does not

---

[13] Traditional AEMLD claims also require the plaintiff to show that a safer, practical, alternative design was available to the manufacturer at the time the product was manufactured. See Beech Through Beech v. Outboard Marine Corp., 584 So. 2d 447, 450 (Ala. 1991), citing Edwards 482 So. 2d at 1191.  Specifically, the plaintiff must prove that the alleged alternative design is "safer." Id. Whether an alternative is "safer" should be determined while "taking into consideration such factors as the intended use" of the product and whether "the utility of the alternative design outweighs the utility of the design actually used." Id.

The test for a safer alternative was first expressed by the Alabama Supreme Court in Edwards 482 So. 2d at 1191:

In order to prove defectiveness, the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured [the product].  The existence of a safer, practical, alternative design must be proved by showing that:

(a)    The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
(b)    taking into consideration such factors as intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect,[]the manufacturer's ability to eliminate the defect, [and whether] the utility of the alternative design outweighed the utility of the design actually used."

Although Federated's brief regarding the design alternative is less than clear, the court is aware that a manufacturing defect can be demonstrated by proof that "an unintended flaw or abnormality . . . renders [the product] more dangerous than it would have been if it had been constructed as intended." Haney v. Eaton Elec., Inc., 528 F. Supp.2d 1262, 1269 (N.D. Ala. 2007).  Under such a theory, proof of a safer alternative is not necessary because the product, had it been designed as intended, already carries with it the necessary safeguards.

presuppose the existence of a defect and proof of an accident is not enough to carry the day.  See Townsend, 642 So.2d at 415; see also Jordan v. General Motors Corp., 581 So.2d 835, 836-37 (Ala. 1991).  Thus, Federated's claim under the AEMLD must fail unless there is sufficient evidence that a defect existed in the lathe at the time of the sale, which defect was the cause of the accident and resulting damages.  See Sears, 395 So.2d at 995.

## 1.    The Testimony of Joseph Filas

To address that burden, Federated advances the testimony of Joseph Filas, a fire consultant.[14]  Filas prepared a report of findings on the fire origin and cause after conducting interviews, reviewing the fire report, and inspecting the accident scene. (See Doc. # 45, Exh. 10 at 3-9.)  Indeed, expert opinion on the cause of the fire or any "piece of the puzzle" would undoubtedly aid the trier of fact in deciding the ultimate issue of defendant's liability.  Harcros, 158 F.3d at 565.

---

[14] There is no pending motion in this case from MCCI to strike the testimony of Filas in accordance with Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  In accordance with its gatekeeper function, the court sees no reason, at the summary judgment stage, to exclude the testimony of Filas.  See United States of America v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) citing Daubert, 509 U.S. at 589 n.7; Frazier, 387 F.3d at 1273 n. 1 (Tjoflat, concurring) ("I cannot imagine a situation in which a court of appeals would hold that a district court has a duty to intervene on its own initiative and convene a Daubert hearing for the purpose of ascertaining whether an about-to-be-introduced expert opinion is reliable."); see also Quiet Technology DC-8, Inc. v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003)(internal citations omitted) and City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998).

Filas provided the following conclusions in his report dated April 5, 2007:

1.  The fire originated within the cutting room compartment of the CNC lathe machine. The CNC metal lathe machine was located within the southeast corner of suite A-6.

2.  The most likely cause of the fire was the ignition of the metal lathe coolant and/or the milling byproducts of the titanium during operation. A failure within the coolant system can cause the machining point, materials, and chippings to overheat and result in a fire.

3.  Further examination of the CNC metal lathe machine, associated components, and systems are recommended to determine a more precise cause of the fire and any contributing factors.

(See Doc. # 45, Exh. 10 at 2.) In his deposition, Filas expounded on those findings:

- The main spindle compartment of the lathe may have been a possible heat source to ignite the coolant because the milling area of the lathe generates heat. (Filas Dep. at 82-83.)
- There was a lot of chipping around the screw at the milling surface that may have prevented coolant from getting to the screw. There was some smoke and heat damage in that area. And that is one potential source for ignition of the coolant. (Filas Dep. at 83.)
- It is possible that the metal lathe machine failed to provide coolant to the tool and screw being machined. That is one possible cause of this fire. If there's no coolant flowing, then we can get ignition of either titanium byproducts or the coolant itself. (Filas Dep. at 93.)
- Evidence of the coolant not flowing is that there were a lot of chippings and turnings around the screw itself. And if there had been coolant flowing, fire damage patterns inside the top of the machine would have indicated coolant flow. (Filas Dep. at 93.)
- Samples from the machine indicated that there existed titanium particle sizes that can burn. Ignition of titanium causes flames, and the flames can ignite the coolant. This would have been an efficient way to start the fire. (Filas Dep. at 94-95.)
- Evidence that the coolant system failed is taken from chippings around the milling area. Had the coolant continued to flow, the flow would have allowed the chippings to fall away from the milling area. "If we had coolant burning

16

and the flow was still going at the time of the fire, then I think we would have fire patterns that would indicate that direction of those nozzles." (Filas Dep. at 101-02.)

## 2.     The Testimony of Peter Schwalje

Federated also advances the testimony of defense witness Peter Schwalje[15] to bolster its position that a defect in the machine at the time of the sale caused the fire and to exclude causes of the fire absent failure of the coolant system. See Sears, 395 So.2d at 995; see also Rudd v. Gen. Motors Corp., 127 F. Supp.2d 1330 (M.D. Ala. 2001). Schwalje, a licensed engineer, agrees with one of the possible causes of the fire set forth by Filas – that the coolant ignited. (Schwalje Dep. at 21.) He ultimately concludes that the ignition of the coolant was due to the machining of the titanium which produced an ignition source.[16]   That is, occurrence of fire when milling titanium unattended for extended times is a conceivable event that has nothing to do with a machine defect.

[T]he fire was caused due to the ignition of coolant or lubricant that was

---

[15] See footnote 14, supra.  There is no pending motion in this case from Federated to strike the testimony of Schwalje in accordance with Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  See also footnotes 3 and 4, supra.  Neither party submitted Schwalje's expert report on summary judgment.

[16] Federated contends that this "admission" by Schwalje – that the normal milling of titanium can produce an ignition source – means that the lathe is unreasonably dangerous as defined by the AEMLD.  (See Doc. # 57 at 15.)  Assuming, arguendo, that the lathe is unreasonably dangerous, Federated's claim on that basis would fail because there has been no attempt on the part of Federated to set forth a safer, practical alternative for milling titanium.  See footnote 13, supra.

utilized in the machining process.  That ignition was caused by virtue of the fact of the machining of the titanium produced the ignition source which, in turn, ignited the hydrocarbon-based cooling material.

There was no evidence existent that there was any failure or malfunction of the cooling system, which would have resulted in an interruption of the coolant or lubricant flow to the machining area.  Of course I have an opinion that the machine was left unattended for a prolonged period of time, which was not proper operating procedure, especially when one is machining in titanium or pyrophoritic metal.

Again, my basic opinion was that I found no evidence of any defect or deficiency in the design of the equipment that was causal to this accident or this fire.

In reaching this conclusion, Schwalje admitted that the fire arose within a one-inch area inside the lathe's milling chamber. (Schwalje Dep. at 23, 83.)  He provided a step-by-step of the process by which he believes the fire began:

Of course in order to have ignition of something, you have to generate a heat source or some ignition source which is capable of igniting.  The coolant will not, in and by itself, auto ignite.  When one machine's titanium, titanium is a metal which is known to combust, there is a lot of heat generating during the machining process.  Titanium also takes rather large cuts when you are machining it.  You generate a significant amount of heat during that process.  The heat that's generated is normally dissipated by the utilization of the cooling and lubricating medium which drops the temperature of it.

Now, if, for example, the tooling itself, the milling cutters become clogged with chips or debris[17] or if there is an interruption of the coolant flow, the

---

[17] As to there being chips or debris which initiated the fire, Schwalje testified:

It's a very conceivable event [that in milling titanium, a fire can start].  If the process – the operating process is conducted properly, it will not.  However, if it is not, it's not attended properly, the tooling has deficiencies, the coolant supply becomes interrupted, then conceivably the material can catch fire.

temperatures can rise.  The material can ignite.  If it does ignite, it is capable
of setting the hydrocarbon coolant on fire.  This has been well-demonstrated
and well-documented both in – I've seen it as a practical condition, and it's
replete in the literature.

(Schwalje Dep. at 23-24.)  But Schwalje also explains that a fire can start[18]  during

the milling process for a myriad of reasons:[19] (1) if not attended, a fire can start if the

---

(Schwalje Dep. at 25.)

[18] The M32Y Basic Manual that was provided with the lathe discusses issues that can
result in fire while operating the lathe.  (See Doc. # 45, Exh. 7 at 2-20.)

- The friction between the workpiece and the tool or the metallic section of
  the machine caused by break or wear of a cutting tool may overheat the
  machine to be fired.
- Because the coolant is not discharged to the machining point enough, the
  workpiece is overheated to fire.  The following causes may be assumed:
  - The position of the coolant nozzle is incorrect.
  - Chips get caught in the coolant nozzle to move the position of the
  coolant nozzle.
  - Because of insufficient coolant in the coolant tank, the coolant flow is
  rather low.
  - Because chips are accumulated in the coolant tank to decrease the
  quantity of coolant flow into the pump, the coolant flow is rather low.
  - Because the filter in the coolant tank is clogged, the coolant flow is rather
  low.
  - Chips are accumulated around the machining point.
- Miscellaneous
  - Inflammable coolant or coolant having only low cooling effect is used to
  cause a fire to occur.
  - Because the temperature is extremely high in the cutting room, the
  coolant is vaporized to cause a fire to occur.
  - A combustible workpiece (flammable workpiece) is subject to machining
  to cause a fire to occur.
  - Because no safety devices are operated, any failure cannot be detected to
  cause a fire to occur.

[19] Federated characterizes Schwalje's testimony as asserting three probable ways the fire
could have started within the one-inch area of the lathe's milling chamber.  Schwalje does in fact
state that the fire could have started because: (1) the titanium produces flaming combustion; (2)

coolant supply is interrupted[20] or the tooling is deficient in some way;[21] (2) if there

tool fractures, tool problems; or (3) the coolant flow became misdirected. (Schwalje Dep. at 84-85.) But he expounds that:

> Those are broad categories. Now, within that, there is [sic] subcategories. For example, tooling. You can have dull tools. You could have the flutes on – that clear the chips away, becoming clogged. Tools have flutes on them. The coolant helps the chips flow up the flutes so that they can fall down and be collected. If they block, you are going to develop chips. Now you are producing fuel in a powdered, fine form, which titanium likes to ignite.

(Schwalje Dep. at 86-87.) The more exhaustive list, which is complete with subcategories (and presumably causes of fire outside the one-inch area), is discussed in the deposition testimony outlined above.

[20] Schwalje says that there is no evidence that the coolant supply became interrupted in this case and denies that an interruption in the coolant supply can be inferred from the fire event. (Schwalje Dep. at 34-35.) Schwalje distinguishes between the interruption of the coolant supply and misdirection of the coolant flow.

> Q:    If, during the machining of titanium a fire occurs, can you infer from that there was an interruption of the coolant supply or else the fire would not have taken place?
> A:    No.
>
> Q:    Why not?
> A:    It could be a misdirection of the coolant. If the nozzles are not positioned or moved from position or become misdirected so not to provide the coolant as to the exact point of the machining operation, there is nothing wrong with the coolant system or the flow. It's just not directed properly. That will allow the high temperature conditions to occur.
>
> Q:    What could cause the misdirection of a coolant nozzle on a Citizen's CNC lathe like the one we have here?
> A:    The joints of the nozzle themselves, or knuckle joints. They could become loosened. There is a potential for a chip from the machining process to hit the nozzle tip and misdirect the tip.

(Schwalje Dep. at 34-35.)

[21] Although Schwalje was able to eliminate the possibility that there was a fracture or a breakage of the tool tip, he was not able to eliminate the possibility that the tool may have

20

is improper programming which results in improper tooling positions;[22] (3) if the cuts that are being performed are generating high tool-tip temperatures that are above the ignition point;[23] (4) if chips clog the coolant nozzles, chips clog the flutes of the milling cutters or the drills or the cutting inserts, the cutting tools, themselves, so as not to allow them to self-clear;[24] and (5) if you are performing drilling or boring operations where the feed rates are improper and the hole does not clear and chips accumulate within the tooling, that can raise temperatures sufficient to cause the titanium materials to ignite.[25]  (Schwalje Dep. at 25-27.)

---

become dulled.  "As the tool becomes duller when machining – any metal, especially titanium, you cause the temperatures to rise dramatically at the point where the tool meets the material." (Schwalje Dep. at 30-31.)  An operator would have been able to determine that the tool was dull by observing the finished pieces and observing the process in motion.  (Schwalje Dep. at 31.) But, overall, Schwalje performed an exam which showed "that the specific cutting tool used at the time of the fire's onset was intact and did not evidence any mechanical damage or chipping that could result in excessive heat or sparks that would initiate a fire."  (Schwalje Dep. at 34.)

[22] According to Schwalje, "the evidence is on the negative side" that improper programming caused the fire because "there were some parts made prior to this that if there was a basic problem with the program, it would have manifested itself before this."  (Schwalje Dep. at 30.)

[23] There was not enough information available for Schwalje to determine whether the cuts actually generated the high tool-tip temperatures that could have caused the fire.  (Schwalje Dep. at 29.)

[24] Schwalje admits that the coolant nozzles, made of plastic, were consumed in the fire, thus there is no way to determine whether chips ultimately clogged the nozzle.  (Schwalje Dep. at 29.)

[25] Schwalje does not think that this scenario is what actually caused the fire because he does not believe that a boring operation was in place at the time of the fire.  (Schwalje Dep. at 27-28.)

21

3.    **The Failure of the Evidence to State a Claim under the AEMLD**

The problem with Federated's position that "it's obvious" that the coolant system failed and caused the fire is that it is not based on substantial evidence creating a genuine issue of material fact from which a reasonable jury could make the same conclusion.  See Sears, 395 So.2d at 995, citing Atkins, 335 So.2d at 140; see also Hessen v. Jaguar Cars, Inc., 915 F2d 641, 647 (11th Cir. 1990).  For liability to attach under the AEMLD there must be some link to a defective product.  See Sears, 395 So.2d at 995; see also Bishop v. Bombardier, Inc., 399 F. Supp.2d 1372, 1379 (M.D. Ga. 2005) (applying Alabama law).  Federated's expert opines that the "most likely" cause of the fire was one of two things – "we ignited the coolant either from a hot source inside the machine, you know, like as in the milling area, *and/or* the ignition of the titanium during the operation from the loss of coolant. (See Doc. # 45, Exh. 10 at 2; see also Filas Dep. at 99-100) (emphasis added).  In fact, Filas says that the ignition of the titanium would have been "an efficient way" for the fire to start. (Filas Dep. at 94-95.)  And while he uses fire burn pattern analysis to conclude that the coolant stopped flowing, he does not have any evidence that the coolant stopped flowing because of a defect in the coolant system itself. (Filas Dep. at 93.)  Instead, when asked whether he has any evidence that manufacturing defects existed in the

lathe, Filas testified:

> I don't know the specific reason why the coolant stopped flowing yet, but there's no evidence that the operator did anything to cause this fire. The fire originated in the unit.  Something had to fail in that unit.  Under normal operating conditions, that unit should not experience a fire.

(Filas Dep. at 103-04.)

Thus, although there can be no dispute that Filas has established that it is *possible* that the coolant system failed, (see Filas Dep. at 101-04), he has done nothing to establish that the failure of the coolant system is a likely scenario and in fact readily admits that further inspection of the machine is necessary to "identify other potential ignition sources and either eliminate them as a cause of the fire or to see if they contributed or caused the fire." (Filas Dep. at 100.)  Indeed MCCI's expert, upon whose testimony Federated also relies, (see doc. # 57 at 12-16), *agrees* with Filas's conclusion that a hot source inside of the lathe is a *likely* cause the fire and resultant property damage in this case. (See Schwalje Dep. at 21, 23-24, 84.)  As both experts have explained, fires during the milling process of titanium can be attributed to a myriad of causes, including not only the failure of the operator to attend to the machine while it is in operation, but also the expected hazards of operating a machine that is used to cut a combustible metal. (See Doc. # 45, Exh. 7 at 2-20.)

Unfortunately for Federated,  "[p]roof which goes no further than to show an

injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." Ex parte Mobile Power & Light Co., Inc., 810 So.2d 756, 760 (Ala. 2001) (quoting Southworth v. Shea, 30 So. 774, 775 (1901)). Filas's testimony that a defect in the cooling system caused the fire is subjective and speculative. See Cook v. Sunbeam Prods., Inc., 365 F. Supp.2d 1189, 1193 (N.D. Ala. 2005).  Therefore, MCCI is entitled to summary judgment on Federated's AEMLD claim.

### B.  Implied Warranty of Merchantability[26] (Count IV)

Count IV of the Complaint asserts a claim for breach of implied warranty of merchantability. Specifically, Federated contends that in selling the lathe to Falciani, MCCI impliedly warranted that the lathe was merchantable when it was *not* merchantable because of a hidden defect posing an unreasonable risk of fire. (See Compl. ¶¶ 45-46.)

Under Alabama law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller[27] is a merchant with respect to the

---

[26] Warranty claims are not subsumed by the AEMLD.  See Tillman v. R.J. Reynolds Tobacco Co., 871 So.2d 28, 34-35 (Ala. 2003); see also Bloodsworth v. Smith & Nephew, 2005 WL 3470337, No. 2:05-cv-622 at *7 (M.D. Ala. Dec. 19, 2005).

[27] That is, the warranty places the obligation on the seller of the goods, not on the manufacturer.  See Weaver v. Dan Jones Ford, Inc., 679 So.2d 1106 (Ala. Civ. App. 1996).

goods of that kind."  Ala. Code § 7-2-314 (1975).  "Merchantability" refers to a product's being, in relevant part, able to "pass without objection in the trade under the contract description" and "fit for the ordinary purpose for which such goods are used."  Id.; see also Ex parte Gen. Motors Corp., 769 So.2d 903, 913 (Ala. 1999). These provisions in the Alabama Code mirror the Uniform Commercial Code ("UCC") provisions on the implied warranty of merchantability.  See U.C.C. § 2-314.

An implied warranty of merchantability arises when: (1) the defendant sold the article in question to the plaintiff; and (2) the seller was a "merchant with respect to goods" of the same kind as the article sold to the plaintiff.  See Storey v. Day Heating & Air Conditioning Co., 319 So.2d 279 (Ala. Civ. App. 1975).  A breach of that implied warranty of merchantability arises where the plaintiff proves: (1) the existence of the warranty; (2) a breach of that warranty; and (3) damages proximately resulting from that breach.  See Barrington Corp. v. Patrick Lumber Co., Inc., 447 So.2d 785, 787 (Ala. Civ. App. 1984) (internal citation omitted); see also Bodie v. Purdue Pharma Co., 236 Fed. Appx. 511, 522 (11th Cir. 2007).

Federated has established the existence of an implied warranty of merchantability in this case.  MCCI sold and delivered the lathe to Falciani and thus

---

Here, although Kearney was the exclusive sales dealer in Alabama for the Citizen lathe, the bull of sale went from MCCI to Falciani.

is a "merchant with respect to" the lathe.  See <u>Storey</u>, 319 So.2d at 281.  But that is where Federated's success ends.  Although the question of whether goods are merchantable is not exactly the same as a the question whether the goods are defective under the AEMLD, <u>see</u> <u>Gen. Motors</u>, 769 So.2d at 913, under an implied warranty of merchantability theory there still must be evidence sufficient to demonstrate that the lathe was not fit for its ordinary purpose – that it did not carry with it an "inherent soundness" which made it suitable for its designed purpose.  See <u>DaimlerChrysler Corp. v. Morrow</u>, 895 So.2d 861, 864 (Ala. 2004); <u>see also</u> <u>Cain v. Sheraton Perimeter Park S. Hotel</u>, 592 So.2d 218 (Ala. 1991) and <u>Rose v. GMC</u>, 323 F. Supp.2d 1244 (N.D. Ala. 2004) (The defect or lack of merchantability must be proved to have been the proximate cause of the plaintiff's injuries.)  Here, Federated has failed to show that the lathe was not fit to machine titanium screws nor that any defect caused the fire.  (<u>See</u> <u>generally</u> Compl.)  Although Joseph Filas testified that the machine caught fire and therefore must have been defective, such testimony is clearly insufficient to establish a hidden defect rendering it unfit to be merchantable. (<u>See</u> Section IV.A., <u>supra</u>.)  Therefore, MCCI is entitled to summary judgment on Federated's implied warranty of merchantability claim.

### C.   Implied Warranty of Fitness for a Particular Purpose[28] (Count VI)

Count VI of the Complaint asserts a claim for breach of implied warranty of fitness for a particular purpose. Federated contends that at the time it sold the lathe to Falciani, MCCI knew that the lathe was needed to manufacture titanium orthopedic screws and impliedly warranted that the lathe would be fit for that purpose, yet that warranty was breached because the lathe contained a hidden defect rendering it unfit for its intended use. (See Compl. ¶¶ 54-58.) Federated's brief expounds on the implied warranty for a particular purpose claim, emphasizing that "MCCI not only knew that Falciani purchased the subject lathe for the specific purpose of manufacturing titanium orthopedic screws, but that Falciani intended to use the machine in a specific, i.e. unattended, mode of operation. The machine manifestly was not fit for this mode of operation if there was a substantial risk of fire occurring during operation which would not be detected while unattended." (Doc. # 57 at 27.)

The implied warranty of fitness for a particular purpose is "narrower, more specific, and more precise" than the implied warranty of merchantability. See Chase v. Kawasaki Motors Corp., U.S.A., 140 F. Supp.2d 1280, 1289 (M.D. Ala. 2001), citing 1 James J. White & Robert S. Summers, Uniform Commercial Code: Practitioner Treatise Series § 9-10 (4th ed. 1995). Section 7-2-315 of the Alabama

---

[28] See footnote 26, supra.

27

Code states:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.

Thus, where there has been no valid modification or exclusion, the warranty will be implied if: (1) the seller has reason to know the buyer's particular purpose; and (2) the seller has reason to know that the buyer is relying on the seller's skill or judgment ti furnish appropriate goods; and (3) the buyer, in fact, relied upon the seller's skill or judgment.  See Donald v. City Nat'l Bank of Dothan, 329 So.2d 92, 95 (1976) (internal citation omitted).  A "particular purpose" differs from an ordinary purpose in that it envisages a specific use by the buyer which is peculiar to the nature of his business. See Official Comment 2 to U.C.C. § 2-315; see also Automated Med. Lab., Inc. v. Armour Pharm. Co., 629 F.2d 1118, 1127, n. 17 (5th Cir. 1980).  In an action for breach of the implied warranty of fitness for a particular purpose, the plaintiff must prove: (1) the existence of the implied warranty; (2) breach of the implied warranty; and (3) damages proximately resulting from that breach.  See Barrington Corp. v. Patrick Lumber Co., Inc., 447 So.2d 785, 787 (Ala. Civ. App. 1984).

Federated's claim for breach of the implied warranty fails at the first step. Federated has not shown that there was in fact an implied warranty. See Donald, 329

So.2d at 95.  While it is undisputed that MCCI knew that Falciani intended to use the lathe to manufacture titanium orthopedic screws, there is *no* evidence that, *at the time of contracting*,[29] MCCI knew that Falciani intended to use the lathe in an "unattended mode of operation."  See King v. Avtech Aviation, Inc., 655 F.2d 77, 79 (5th Cir. 1981); see also Chase, 140 F. Supp.2d at 1289.  Accordingly, absent the existence of an implied warranty, there can necessarily be no breach or resultant damage.  See Barrington, 447 So.2d at 787.  Summary judgment is due to be granted on Federated's claim for breach of implied warranty of fitness for a particular purpose.

## V.     Conclusion

For the reasons asserted above, there being no dispute as to any material fact, Defendant Marubeni Citizen-Cincom's Motion (doc. # 45) for Summary Judgment is due to be granted.  A separate order will be entered dismissing all claims.

**DONE** this the ___23rd___ day of October, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE

------------------------------------------------

[29] There is some disputed evidence that MCCI knew *after* it had sold the lathe to Falciani that Falciani intended to run it unattended.  (See Summerford Dep. at 29, 65-66; see also Summerford Aff. at ¶ 13.)